```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                      SOUTHERN DIVISION
 4
 5   KASEY D. ALVES,
 6           Plaintiff,
 7        VS.                    CAUSE NO.: 1:06cv912 LG-JMR
 8   HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
 9   HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND,
10   HEALTH ASSURANCE, LLC.,
11           Defendants.
12
13                        DEPOSITION
14                            OF
15                      WILLIAM MARTIN
16           Taken on behalf of the Plaintiff
17        1:41 p.m., Wednesday, March 12th, 2008
18                         before
19            Lisa H. Brown, CSR #1166
20
21
22
23              COAST-WIDE REPORTERS
                  Court Reporters
24               Post Office Box 95
           Biloxi, Mississippi  39533-0095
25                 (228) 374-5066
```

Exhibit 6

```
 1                    WILLIAM MARTIN,
 2  Having been produced and first duly sworn, was
 3  examined and testified as follows:
 4                        - - -
 5                     EXAMINATION
 6  BY MR. PRINGLE:
 7       Q.   Please state your name.
 8       A.   William Martin.
 9       Q.   Mr. Martin, you're currently a member of the
10  Board of Supervisors --
11       A.   Yes.
12       Q.   -- for Harrison County?
13       A.   Yes.
14       Q.   You're currently the president of the Board?
15       A.   Yes.
16       Q.   What years have you been serving on the
17  Board?
18       A.   Since 1999, through the present.
19       Q.   You're also a licensed practicing attorney?
20       A.   Yes.
21       Q.   And, at one time, you were an Assistant
22  District Attorney?
23       A.   Correct.
24       Q.   What years were you Assistant District
25  Attorney?
```

1  A.  1987, and 1989 through 19- -- April of 1996.
2  Q.  As a member of the Board of Supervisors, what
3  role does the Board have in the management of the
4  Harrison County Detention Center?
5  A.  Appropriations.
6  Q.  Any others?
7  A.  No.
8  Q.  Let me show you Exhibit 1.  It's a Consent
9  Judgment, January 12, 1995, from the U.S. District
10 Court.  Have you seen this before?
11 A.  Yes.
12 Q.  Have you had an opportunity to review it and
13 read it before?
14 A.  Before, I have.  I haven't read it recently.
15 Q.  Yeah, okay.  And you're aware that one of the
16 Defendants in this case was Harrison County,
17 Mississippi?
18 A.  Yes.
19 Q.  And you're aware that basically the judgment
20 requires certain compliance with the agreement
21 concerning the Harrison County jail and the conditions
22 there?
23 A.  Yes.
24 Q.  And what does the Board of Supervisors do to
25 ensure compliance with this Consent Judgment?

1  being trained properly.
2      Q.  Did the sheriff's department ever submit
3  their training program to the Board?
4      A.  No.  But, I mean, I don't know what -- even
5  had they submitted it to me, I don't know how the
6  sheriff's office or the jailers are supposed to be
7  trained, so I would just have been reading, basically.
8  I mean, I don't know the day-to-day operations of the
9  sheriff's department or the jailers or booking people
10 in or anything else, so submitting it to me really
11 wouldn't have been of much benefit as far as I'm
12 concerned.
13     Q.  Okay.  Bottom of page two.  It says, "The
14 morale of the staff was extremely low.  Staff claimed
15 they are over worked."
16         Were you aware of that finding?
17     A.  I wasn't aware of that finding, but I was
18 aware the staff -- that the morale of the staff was
19 extremely low.  That was in 2006, the latter part of
20 2006.
21     Q.  How were you informed of that or how did you
22 learn that?
23     A.  Well, I'm a criminal defense attorney.  I
24 was aware of the Williams case and I knew that morale
25 after that case was extremely low.  In fact, I thought

```
 1  it was low prior to that case, but that's because, I
 2  mean, I spend a lot of time at the jail, not as a
 3  Board of Supervisor but as an attorney.
 4       Q.   Are you still doing criminal defense work?
 5       A.   Of course.
 6       Q.   How long have you been doing that?
 7       A.   Since I left the District Attorney's office
 8  in April of 1996.
 9       Q.   Go to page three.  First paragraph, middle
10  of the page, it says, Dr. Cabana stated there were
11  approximately fifty-seven staff vacancies.  Were you
12  aware of that finding?
13       A.   I was not aware of that particular finding.
14  I did know that there were staff vacancies, but
15  everybody knew there were staff vacancies.
16       Q.   Did you ever have any conversation with Mr.
17  Cabana, individually or at the Board meetings or
18  executive session, as to what was causing the staff
19  vacancies?
20       A.   I know that -- of course, I have had a
21  conversation with Mr. Cabana in the Board meetings,
22  individually, at meetings at the jail, in regard to
23  staff vacancies and I knew -- I knew that the reason
24  was because, number one, morale; number two, the
25  Williams case had a lot to do with the morale; number
```

```
 1        A.   Not until after the fact.
 2        Q.   That would've been after he was appointed
 3   warden at the jail?
 4        A.   Yes.
 5        Q.   Look at the bottom of page three.
 6        A.   Okay.
 7        Q.   In the last paragraph it says, "Due to
 8   inadequate staffing levels, poorly trained staff,
 9   limited supervision, crowded conditions, failure to
10   follow established policies and procedures, inadequate
11   classification options and intake/release process that
12   is inefficient and ineffective, the Harrison County
13   Detention Center is neither safe nor is it secure."
14             Were you aware of that finding?
15        A.   Not from this particular report, but I was
16   aware of those conditions.
17        Q.   You didn't need this report to tell you that?
18        A.   No.  Mr. Cabana was basically telling us
19   that every time he saw us, and we were taking actions
20   to try and correct that.
21        Q.   Well, were you aware of these conditions
22   before Mr. Cabana was telling you about them?
23        A.   No.  I was aware -- let me put it like
24   this.  I was aware of the staffing issues, okay.  Let
25   me see what else this paragraph says.  I was aware of
```

```
 1  out, ain't it?
 2       Q.   Okay.  Did you ever have a chance to talk to
 3  Sheriff Payne about his concerns about violence in the
 4  booking area?
 5       A.   Prior to this or before this report?
 6       Q.   At any time.
 7       A.   Yeah, prior to this.  I haven't talked to
 8  sheriff after this report.  I haven't talked to the
 9  sheriff -- I can't even remember the last time I
10  talked to sheriff.  I know I talked to the sheriff
11  about my concerns about violence in the jail prior to
12  this report over a number of years.
13       Q.   What were your concerns about it?
14       A.   Well, periodically the Board received
15  written complaints from inmates that they were being
16  beaten.  We turned those complaints over to the
17  District Attorney's office for investigation.
18       Q.   You talked to the sheriff about your
19  concerns?
20       A.   Yeah.
21       Q.   What was his response to your concerns?
22       A.   That they were working on it.  That was the
23  purpose of -- one of the purposes of the Harrison
24  County Criminal Justice Coordinating Council was to
25  try and -- everything was related back to
```